UNITED STATES of America,

v.

Monica Blanca MANZANO–
EXCELENTE, Defendant.

No. 94 Cr. 393 (CSH).

United States District Court,
S.D. New York.

July 29, 1996.

Mary Jo White, United States Attorney, New York City, (Andrea L. Labov, Assistant United States Attorney, of counsel), for the U.S.

Lawrence M. Herrmann, Jackson Heights, NY, for Defendant.

*MEMORANDUM AND ORDER*

HAIGHT, Senior District Judge:

Defendant Monica Blanca Manzano–Excelente ("Manzano") was convicted with a co-defendant after jury trial of conspiring to distribute 80 kilograms of cocaine. Manzano is awaiting sentence. Her conviction leaves her vulnerable to a ten-year mandatory minimum sentence. Manzano applies for consideration under the "safety valve" provisions of the Mandatory Minimum Sentencing Reform Act of 1994, ("MMSRA"), 18 U.S.C. § 3553(f). The government opposes that application.

## I

The one-count indictment charged four individuals with conspiring to distribute cocaine. These were Luis Alberto Gutierrez–Flores, Arturo Sanchez–Hernandez ("Sanchez"), Miguel Ordonez, and Manzano. Sanchez and Ordonez pleaded guilty before trial. They did not enter into cooperation agreements with the government, and did not testify. Gutierrez–Flores and Manzano proceeded to trial. Neither testified on their own behalf. The jury convicted both.

The government's principal witness was Betty Noguera, a conspirator who was cooperating with the government. Noguera testified that in May 1994, certain individuals met in Miami, Florida, to discuss the transportation of 80 kilograms of cocaine by truck from Texas to New York. Another meeting of conspirators occurred in El Paso, Texas, where the cocaine was loaded in a truck, for transportation to New York. Noguera drove the truck, accompanied by a male friend. She began the trip on May 30, 1994. On June 1, an Illinois State trooper stopped the truck for a speeding violation. Noguera consented to a search of the truck whereupon the cocaine shipment was discovered. Noguera and her friend were arrested. Noguera agreed to cooperate with the Drug Enforcement Administration. The DEA turned the transaction into a controlled delivery. Surveilling agents awaited the arrival of the truck in New York to see who would come forward to accept and process the cocaine shipment.

On June 3, 1994, Noguera and her friend arrived in New York in the truck, which was carrying ten of the kilograms of cocaine that had been seized by the police and agents in Illinois.

As will be described in greater detail under Point II, Manzano had accompanied Sanchez by plane from Los Angeles to New York on June 2, 1994. They registered at the Hotel Edison in Manhattan. The events giving rise to the arrest of the four individuals occurred on June 3. Sanchez gave instructions to Noguera to park the truck in front of the hotel. After various telephone calls and face-to-face discussions, some of which were recorded by Noguera, the arrests were made.

The only evidence the government offered at trial tending to implicate Manzano in the conspiracy came from Michael Smith, a surveilling DEA agent, who testified that as the truck driven by Noguera slowed down at an intersection close to the Hotel Edison, it appeared to him that Manzano, standing on the sidewalk, motioned with her hand in a manner that Smith interpreted as a direction to Noguera where to park the truck. Trial Transcript ("Tr.") at 518. In addition, Noguera testified that during a conversation she had with Manzano in the lobby of the Hotel Edison, Manzano asked Noguera if it were true that there were only "80," *id.* at 231, which Noguera testified she interpreted as being an inquiry by Manzano about the total amount of cocaine in the shipment.

That was the extent of the government's proof against Manzano. Her counsel moved for a judgment of acquittal at the conclusion of the government's case under Rule 29, Fed. R.Crim.P. I denied the motion. Manzano did not testify in her own defense. The jury convicted her.

## II

Prior to the passage of the MMSRA, defendants convicted of certain drug crimes could receive a sentence below the statutory minimum only on the government's motion to depart downward based on a defendant's substantial assistance to the authorities. *See* 18 U.S.C. § 3553(e); U.S.S.G. § 5K1.1. In-

equities arose because the least culpable members of a drug conspiracy often had no useful information to give to the government, but were subject to the mandatory minimum sentences. To redress that inequity, § 3553(f) allows the sentencing court to disregard the statutory minimum in sentencing first-time nonviolent drug offenders who played a minor role in the offense and have made a good-faith effort to cooperate with the government.

§ 3553(f) allows the trial court to disregard a mandatory minimum sentence "if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation," that five factual conditions have been met. In the case at bar, there is no dispute that Manzano satisfies the first four criteria. The dispute involves the fifth criterion, which requires the court to find that

> not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

It is important to note that "Congress added the safety valve provision in part to grant relief to defendants whose knowledge may be of little or no use to the government, and who would thus be ineligible for reduction under the substantial assistance provision of the guidelines, U.S.S.G. § 5K1.1." *United States v. Shrestha,* 86 F.3d 935, 938–39 (9th Cir.1996). Subsection (5) of the safety valve provision has been termed a "tell all you can tell" requirement, in fulfillment of which "the defendant must provide, prior to sentencing, all information at his disposal which is relevant to the offense, whether or not it is relevant or useful to the government's investigation." *Id.* (citing cases).

Under the plain wording of the statute, it is for the sentencing court, and not the government, to determine under subsection (5) whether or not a particular defendant is telling all that he or she can.

### III

In the case at bar, Manzano says that with respect to the drug transaction charged in the indictment, she has nothing to tell. She says that she accompanied Sanchez, with whom she was at that time romantically involved, from Los Angeles to New York at Sanchez's invitation, for sightseeing (Manzano had never been in New York), shopping, and entertainment. Manzano says that she had no knowledge that Sanchez was involved in a drug transaction. She now reproaches herself for not asking Sanchez questions about his conduct and questionable acquaintances, particularly Noguera, whom Manzano regarded with understandable distaste when she met her on June 3.

As noted, Manzano did not testify at trial. Within the sentencing context, she testified before the Court on May 23, 1996 and was cross-examined by the government. What follows is derived from that testimony.

Manzano was born in Vera Cruz, Mexico. She is 27 years old, and accordingly was 25 at the time of the acts alleged in the indictment.

About three months before her arrest, during the Easter season, Manzano met Sanchez, an older man, in Mexico. Sanchez told Manzano that he was an engineer employed by Pemex, the large Mexican oil company. At the time of their meeting, Manzano was a student of civil engineering at the University of Vera Cruz.

A time came in late May 1994 when Manzano was invited by Sanchez to join him in Los Angeles. Purchasing her own ticket, Manzano flew from Vera Cruz to Houston and then from Houston to Los Angeles. She spent a day or so in Los Angeles with Sanchez. Sanchez then suggested that she accompany him to New York. Sanchez told Manzano that someone in New York was going to pay him some money, and that he and Manzano could spend a few days in New York before she returned to Mexico.

Manzano and Sanchez arrived in New York during the afternoon of June 2. They registered at the Hotel Edison, rested, went out for dinner, walked about for a few blocks and returned to the hotel for the night.

The next morning, Manzano and Sanchez got up at about 9:30 or 10:00 a.m. and went out. Sanchez said they would go shopping or to the theater. When on the street, Sanchez told Manzano he had to make a telephone call, which he did from a public telephone. Sanchez told Manzano that he was going to meet with a female who would give him the money he expected. They waited a few minutes but nobody appeared. Manzano became irritated. Sanchez took her to a restaurant so she could have breakfast, and left. Sanchez reappeared in the company of Betty Noguera. They exchanged inconsequential comments. Manzano formed the impression that Noguera was poorly educated and not from a good background. Sanchez suggested to Noguera that Noguera also register at the Hotel Edison. When Sanchez and Manzano arrived at the hotel, Sanchez made another telephone call from a public telephone. Noguera arrived. Manzano left Sanchez and Noguera in the hotel lobby and returned to the room. Sanchez left Manzano in the room, telling her that he would go and register Noguera at the hotel. Manzano waited, became impatient, and went down to the lobby. Sanchez registered Noguera and then exchanged words with two other males. Sanchez, one of the males, and Manzano walked for a few blocks around the hotel, Sanchez in conversation with the other male. They returned to the hotel. Manzano and Sanchez went up to their room, where shortly thereafter they were arrested.

Manzano denied that she ever had a conversation with Noguera about "kilos," or that she ever put a question to Noguera including the number "80." Manzano also denied giving any directions to Noguera about where to park the truck. The relevance of that testimony will appear in the discussion under Point V.

Manzano testified that before her arrest on June 3, she did not know that Sanchez was involved in a drug transaction. Before her arrest, she did not know that the truck driv-

en by Noguera contained drugs. She did not ask Noguera about the quantity of drugs she was carrying. She did not knowingly assist in a drug transaction.

Manzano submitted to a polygraph test with respect to the veracity of her answers to those four questions. Manzano wished to have the polygraph examiner testify at the hearing, but I sustained the government's objection. The government stipulated that Manzano passed the test.

## IV

■ The government contends that I should not credit Manzano's account. I will deal with that subject under Point V. But the government's first contention is that even if I believed Manzano's testimony, I cannot make that testimony the basis of granting her relief under § 3553(f), because the sentencing court is bound in law to accept the facts necessarily implicit in the jury's verdict. In support of that proposition, the government cites *United States v. Weston,* 960 F.2d 212, 218 (1st Cir.1992), and *United States v. Hourihan,* 66 F.3d 458, 465 (2d Cir.1995), in which the Second Circuit cited *Weston* with approval.

In *Weston,* the defendant was convicted after jury trial of threatening bodily injury with intent to retaliate for information given to law enforcement officials.

At sentencing, the trial judge had to consider the applicability of an eight-level enhancement "[i]f the offense involved ... threatening to cause physical injury to a person ... in order to obstruct the administration of justice." U.S.S.G. § 2J1.2(b)(1). The trial judge expressed his own view that a preponderance of the evidence did not show that Weston went to the victim's home "with an actual affirmative intention to dissuade [the victim] from continuing to cooperate with the government." 960 F.2d at 218. However, he said that he felt "bound by the jury's determination that he did retaliate against [the victim] in the words of the charge 'with intent to retaliate for information given by [the victim] to law enforcement officers.'" The trial judge concluded that this "jury determination on what is an ele-

ment of the charged offense, as it is charged in the indictment, is sufficient to trigger the 8 level increase." *Id.*

Weston argued on appeal that the trial court abdicated its responsibilities "when, in deciding to apply U.S.S.G. § 2J1.2(b)(1), it deferred to the guilty verdict." 960 F.2d at 218. The First Circuit affirmed. Although the Court of Appeals recognized that "an acquittal is not always conclusive on an issue for sentencing purposes due to differing standards of proof," it added that "a guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily implicit in the verdict." *Id.*

In *Hourihan,* the jury convicted defendant on the charged offense of sexual abuse. At sentencing, the trial judge expressed the view that the evidence established the crime of sexual contact, a less severe offense. Accordingly he applied the lower sentencing guideline range applicable to sexual contact. Under the statute, sexual contact is not a lesser included offense in a charge of sexual abuse; and, at the trial, a lesser included offense charge was neither requested or given. In these circumstances, the Court of Appeals held that the trial judge impermissibly disregarded the finding of sexual abuse necessarily implicit in the jury's guilty verdict, citing and quoting *Weston* for that proposition.

Both *Weston* and *Hourihan* involve the binding effect of a jury's guilty verdict upon the trial judge's calculation of the proper sentencing range under the guidelines. Neither case considered the effect, if any, of the jury's verdict upon the function the trial judge performs under § 3553(f)(5). There is apparently no reported case addressing that question.

The government says that this is a distinction without a difference. It contends that the inhibiting effect of the jury verdict upon the trial judge at sentencing, declared in principle in *Weston* and *Hourihan,* is squarely applicable in practice to the case at bar.

The government points out, quite correctly, that I charged the jury that to convict Manzano of conspiracy, the jury had to find that Manzano, with knowledge of the exis-

tence of the charged conspiracy and its illicit purpose, voluntarily became a member. In response to a charge containing that instruction, the jury found Manzano guilty. In consequence, the government argues, a determination by the Court at sentencing that Manzano truthfully denied any knowledge of the drug transaction, and in doing so told all that she knew, thereby qualifying for the safety valve provision, would fly in the face of a finding of knowledge necessarily implicit in the jury's verdict. The principle of jury finality expressed in *Weston* and *Hourihan,* the government's argument concludes, precludes as a matter of law the sentencing court from performing that exercise.

There is considerable force to that argument, which was ably made by the prosecutor at oral argument. However, I conclude that upon analysis, the argument does not stand up. I have several reasons.

First, § 3553(f)(5) explicitly places upon the trial court the responsibility of determining whether a defendant, otherwise qualified for safety valve consideration, is truly telling all that he or she knows about the charged offense. The court makes that determination: not the government, as the statute states explicitly, nor the jury, by what one might term necessary implication.

■ Nor is application of the safety valve provision automatically precluded whenever a defendant stands trial and is convicted. In *United States v. Shrestha, supra,* the Ninth Circuit affirmed the trial judge's finding that the defendant satisfied the requirements of § 3553(f)(5) on the basis of statements he made to customs officers at the time of his arrest, notwithstanding the fact that in his trial testimony the defendant recanted that confession and denied all knowledge of carrying drugs, a denial which he reiterated during the sentencing hearing. 86 F.3d at 939–40.

■ Under the plain wording of § 3553(f)(5), the trial judge has both the power and the obligation to decide whether and at what time a defendant told all that he or she knew.

Second, Manzano did not testify at trial. She did not subject her credibility to the

scrutiny of and evaluation by the jury. That is significant because it implicates the question of whether a trial judge may accept a defendant's denial as credible and thus in fulfillment of the requirements of subsection (5), without impermissibly disregarding findings "necessarily implicit" in the jury's guilty verdict, as that phrase is used in *Weston* and *Hourihan*.

I think that the adjective "necessarily" is important to the analysis. The case for Manzano in respect of the safety valve provision would be much more difficult if she had testified at the trial, given the same account that she gave during the sentencing hearing, and the jury, having reflected upon that account, rejected it, as the jury would have to do to arrive at a guilty verdict. In those circumstances, it could be said that the jury's rejection of the defendant's version of the facts as incredible was *necessarily* implicit in its verdict. I do not think that can be said when the defendant does not testify. In that circumstance, what is *necessarily* implicit in the jury's verdict is its conclusion that the government offered sufficient evidence from other sources, direct or circumstantial, to sustain its burden of proof.

If that is a correct analysis, then I may credit Manzano's account and extend to her the benefit of the safety valve provision, without doing violence to the jury's verdict or to any finding *necessarily* implicit in that verdict. I believe this to be a correct analysis.

My third reason relates to questions of policy. The government stresses the finality of jury verdicts as a desirable policy. I agree; but other policies are implicated by § 3553(f)(5), a remedial statute which includes the word "reform" in the title bestowed upon it by Congress.

■ One must accept the reality that an individual, innocent of the crime charged, may yet be convicted by the jury on legally sufficient evidence. That possibility will exist so long as fallible men and women, rather than angels, administer the criminal justice system. Such a defendant, confronting a mandatory minimum sentence, will presumably wish to invoke the MMSRA. That is what Manzano seeks to do in the case at bar.

A defendant meeting the first four statutory criteria—as does Manzano—must then satisfy the trial judge that the fifth criterion has been satisfied: that the defendant has told all that he or she can. If the judge finds that the defendant has done so, the MMSRA applies, whether or not the defendant's statement confers any benefit upon the government. But if the jury's guilty verdict precludes the judge from exercising his statutory function under § 3553(f)(5), as the government argues at bar, the consequences of a possibly mistaken verdict go unabated. I do not accept that proposition. The government may regard this analysis as judicial jury nullification. I regard it as the performance of a judicial responsibility mandated by Congress.

I conclude, therefore, that if I accept Manzano's testimony before me as credible, I may extend to her the benefits of the MMSRA. I consider her credibility under Point V.

### V

■ I find that in her testimony before the Court, Manzano told all that she knew about the charged drug conspiracy. That is, of course, very little. I will state my reasons for finding Manzano to be a credible witness.

While Manzano is obviously an interested witness, it does not necessarily follow that she was not telling the truth. That is what trial judges traditionally tell jurors, and I apply that principle.

Manzano's demeanor while testifying was that of a forthright witness. Her account is inherently credible. It is not beyond the bounds of human experience that a 25–year old university student, untravelled and relatively unsophisticated, would be sufficiently impressed by an apparently well-established older man to accept his invitation to sample the bright lights and pleasures of Los Angeles and then New York. Manzano has no prior criminal record. There is no reason to doubt that when she first fell in with Sanchez, she was as she described herself: a student uneventfully pursuing a degree in civil engineering. The government offered no evidence that Manzano was referred to by

the conspirators during their preparatory meetings in Miami and El Paso.

These circumstances do not exclude a spur of the moment request by Sanchez in Los Angeles, or on the plane to New York for that matter, that Manzano assist him in the drug transaction. But the question arises why he would do that. Noguera was on her way in the truck to New York with the drugs; several conspirators were foregathering there to receive the drugs and pass them along the illicit chain of commerce. The conspiracy's need for Manzano's assistance is not apparent. And Sanchez would prefer, one may assume, to limit the number of persons who knew he was a drug dealer. He would have a particular interest in concealing that aspect of his character from a young woman with whom he had become intimate.

The credibility of Manzano's account increases with the frailty of the government's evidence against her. That evidence, while in my view sufficient in law, is frail. The only incriminating statements ascribed to Manzano were described by Noguera, who as a conspirator and cooperating witness facing sentence had an interest in implicating others. Noguera's testimony about Manzano included factual stretches at key moments. On direct examination Noguera described her discussion with Manzano in the hotel lobby as follows:

Q. Then what happened?

A. Then he came back to me and we started talking. Then I move out of there because he was still waiting for the man to come back. I went to Monica. She was playing with her hair and she asked me if it was true.

Q. If what was true? What did she say?

A. She asked me if it was true that it was only 80 kilos in there.

Tr. 230.

That answer apparently startled the prosecutor. This transpired next:

Q. Did she say the word kilos?

A. No, she didn't say it like that.

Q. What did she say?

A. She asked me if it was true there was only 80.

Q. And what did you say?

A. I said yes.

Tr. 230–231.

But Noguera again contributed the vital word "kilos" on cross-examination by Manzano's counsel:

Q. When you saw her for the first time, you had no idea who she was, right?

A. That's why I ask who she was, because she was asking me.

Q. Because?

A. She was asking me questions, too.

Q. She was asking you questions?

A. Yes.

Q. What questions was she asking you?

A. She asked me if it was true that I have 80 kilos.

Q. You told us this morning when Ms. Labov asked you that they didn't use the word kilos, didn't you?

A. No she, didn't say kilos.

Q. So why did you just say now 80 kilos?

A. To make you understand what I have to say—

Q. Don't worry about what I understand. These are the folks that have to understand.

Tr. 334.

Noguera's editorial contributions of the word "kilo" are vital, since the argument on behalf of Manzano at trial was that any reference to "80" in the conversation related to the price of a room at the hotel. One such gilding of the lily may be honest exaggeration. Two are suspicious.

The testimony of surveilling agent Smith about the hand gesture he thought he saw Manzano give to Noguera, as Noguera was approaching the hotel in the truck, is not necessarily probative of Manzano's knowledge that there were drugs in the truck. Manzano knew from the restaurant meeting that Sanchez was making arrangements for Noguera to stay at the hotel.

The government attacks Manzano's credibility in several ways. First, it is argued that Manzano, asked on direct examination to describe the events that occurred in New York, left out details that were elicited on

cross-examination. The question on direct to which Manzano responded was: "Ms. Manzano, would you please tell us from the time you got to New York until you were arrested, what you heard, what you did?" Tr. 10.

This question called for the sort of "narrative" answer that is usually disfavored in trial testimony. The events occurred two years ago. It is not surprising that Manzano left out some details. I do not agree with the government that Manzano's memory was suspiciously selective.

Second, the government says that Manzano's hearing testimony is contradicted by statements she made to an Assistant United States Attorney during a post-arrest proffer session. DEA agent Joseph Denehy testified at the hearing from notes that he made during that session. Manzano was interviewed through an interpreter. Following the session, Manzano's then attorney told her that the government's best offer was a plea to a drug telephone count, which would involve a prison term of four years. Manzano turned down the offer and went to trial.

Manzano said nothing during the proffer session inconsistent with the principal assertions in her testimony, namely, that she did not know Sanchez was engaged in a drug transaction and did not participate in it. The perceived inconsistencies stressed by the government deal with peripheral matters. Manzano did not have then the limited command of English that she does today. Denehy's notes and testimony reflect his understanding of the interpreter's understanding of what Manzano said in response to a question put by the prosecutor in English and translated into Spanish. Inaccuracies or misunderstandings are not unknown in such circumstances. Manzano identified several in her testimony on redirect. To the extent that any inconsistencies between Manzano's proffer statement and her hearing testimony are not explainable by those circumstances, I do not regard them as material to the issue of her credibility. I have performed the exercise that trial judges instruct jurors to perform in assessing the effect of prior inconsistent statements. We traditionally say:

The testimony of a witness may be discredited or impeached by showing that he or she has previously made statements that are different than or inconsistent with his or her testimony here in court. You are to determine the credibility, if any, to be given the testimony of a witness who has made prior consistent or contradictory statements.

In making this determination you may consider whether the witness purposely made a false statement or whether it was an innocent mistake; whether the inconsistency concerns an important fact, or whether it had to do with a small detail; whether the witness had an explanation for the inconsistency, and whether that explanation appealed to your common sense.

Viewed in the light of these criteria, any inconsistencies between Manzano's proffer statement and her testimony are insignificant.

VI

Because I find Manzano's hearing testimony to be credible, I conclude that she has told all that she knows about the charged crime. It follows that she is entitled to the benefit of the safety valve provisions of the MMSRA, 18 U.S.C. § 3553(f).

Accordingly the mandatory minimum sentence will not be applied. Manzano will be sentenced in accordance with the United States Sentencing Guidelines. I will call the case for sentencing on September 16, 1996, at 10:00 a.m. in Room 17C, 500 Pearl Street. Sentencing memoranda, including any applications for upward or downward departures, must be filed and served on or before August 30, 1996.

It is SO ORDERED.