**UNITED STATES of America**

v.

**George Thomas FREEMAN**

**No. 00–282–CR.**

United States District Court,
S.D. Florida,
Miami Division.

April 12, 2001.

Brian Frazier and Melissa Damian, AUSA, Miami, FL, for Plaintiff.

Miguel Caridad, AFPD, Miami, FL, Orlando Do Compo, AFPD, Miami, FL, for Defendant.

## MEMORANDUM OPINION

JORDAN, District Judge.

A defendant who is convicted of a specified narcotics offense carrying a mandatory minimum sentence can avoid that minimum sentence, and receive a sentence within the range otherwise prescribed by the Sentencing Guidelines, if he meets certain "safety valve" criteria. *See* 18 U.S.C. § 3553(f); USSG § 5C1.2.[1] *See also* USSG § 2D1.1(b)(6) (providing for a two-level decrease for a defendant who satisfies § 5C1.2 and whose offense level is twenty-six or higher). Among other things, the defendant must, "not later than the sentencing hearing, ... truthfully provide[ ] to the government all information and evidence [he] has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan[.]" § 3553(f)(5).

The interesting issue in this case is whether a judge is precluded, as a matter of law, from finding that a defendant has satisfied § 3553(f)(5) if, in the face of a jury finding that he knew he was carrying narcotics, the defendant maintains (in his testimony at trial and in his safety valve statement) that he lacked actual knowledge. Although it will be extremely rare for a judge to credit such an assertion of innocence after a guilty verdict, I conclude that there is no bar to doing so.

### I. BACKGROUND

On April 4, 2000, at approximately 10:30 a.m., George Thomas Freeman, a 50–year

---

1. Because § 3553(f) and § 5C1.2 have the same relevant language, I will cite to § 3553(f) throughout the rest of this opinion unless the context otherwise requires.

old part-time high school teacher from Washington, D.C., arrived at Miami International Airport on board an American Airlines flight originating in Barbados. In his U.S. Customs declaration form, Mr. Freeman indicated that he had been in Barbados for business and listed value of the items he was bringing in as zero. Mr. Freeman, who had traveled internationally several times before, cleared Customs, and proceeded (probably by mistake) with his suitcase to the U.S. Department of Agriculture's inspection line. A USDA inspector noticed something strange in the x-ray of Mr. Freeman's suitcase, and asked a Customs inspector for assistance.

The Customs inspector took Mr. Freeman and his suitcase to a secondary inspection area. The inspector noticed that Mr. Freeman's airline ticket had been purchased in cash the day before his departure from Washington, D.C. Mr. Freeman, in response to a question, told the inspector that the suitcase was his and that he was transporting wooden artifacts for someone. The inspector opened the suitcase, which contained clothing, straw baskets, and cardboard boxes with wooden artifacts. When the inspector probed the suitcase, she found that it had a false wooden bottom. Upon further investigation, the inspector discovered a white powdery substance that tested positive for cocaine. In all, the suitcase and its false bottom contained 1.8 kilograms of cocaine. A post-it note in one of Mr. Freeman's pockets read "I want to be a multimillionaire."

A grand jury charged Mr. Freeman with importing cocaine and possessing cocaine with the intent to distribute. *See* 21 U.S.C. §§ 841, 952. Mr. Freeman pled not guilty and proceeded to trial. Because it was undisputed that Mr. Freeman's suitcase contained cocaine, the only real issue was Mr. Freeman's knowledge. At both trials I declined the government's request

for a deliberate ignorance instruction in light of cases like *United States v. Rivera,* 944 F.2d 1563, 1570–72 (11th Cir.1991). The jury in Mr. Freeman's first trial could not reach a verdict, and I declared a mistrial. The jury in Mr. Freeman's second trial returned a verdict of guilty on both counts.

### A. THE FIRST TRIAL

At the first trial, the government introduced the post-arrest statement that Mr. Freeman gave to a Customs agent. Mr. Freeman told the agent that the suitcase did not belong to him. Mr. Freeman explained that he had planned a trip to Barbados during spring break. When a friend of his named Ralph Queen (whom he had known for two years) asked him to bring back artifacts from Barbados and offered to pay his expenses, Mr. Freeman agreed. Mr. Queen paid for Mr. Freeman's round-trip ticket in cash the day before his departure from Washington, D.C. Mr. Queen told Mr. Freeman that he would be contacted at his hotel by a man named Franklin. After Mr. Freeman arrived in Barbados, Franklin called him at the hotel and told him he had the artifacts for Mr. Queen. Franklin arrived unannounced at the hotel later that day and entered Mr. Freeman's room through an open window. Mr. Freeman encountered Franklin when he returned to his room after spending some time on the beach. Mr. Freeman checked the suitcase Franklin gave him to make sure that the artifacts were inside. On the day of his departure, Franklin gave Mr. Freeman a ride to the airport. Mr. Freeman was supposed to meet Mr. Queen in Washington, D.C. At the conclusion of the interview, Mr. Freeman gave the Customs agent Mr. Queen's phone number in Washington, D.C.

The government also presented evidence that Mr. Freeman had traveled to Barba-

dos with Mr. Queen on February 14, 2000. Not counting carry-on bags, Mr. Freeman checked two pieces of luggage on that trip, while Mr. Queen checked four. When he returned to the United States on February 17, 2000, Mr. Freeman checked in one piece of luggage. Mr. Queen, who returned on February 18, 2000, checked in two pieces of luggage. The government's theory was that Mr. Freeman had returned to Barbados to retrieve the luggage that had been left behind so that it could be loaded with cocaine.

Mr. Freeman did not testify at the first trial.

## B. THE SECOND TRIAL

The second trial did not proceed like the first, as the parties altered their litigation strategies. The government, for example, chose not to introduce Mr. Freeman's post-arrest statement in its case-in-chief. Mr. Freeman, in contrast to the first trial, took the stand. He also presented the testimony of an acquaintance to support his claim that he had been set up by Mr. Queen.

### 1. MR. FREEMAN

Mr. Freeman testified that he met Mr. Queen at a fashion show two years earlier, and had an amorous relationship with him for a couple of months. The two remained friends after they broke off the relationship, and traveled together to Barbados on February 14, 2000, with Mr. Queen paying Mr. Freeman's expenses. While in Barbados Mr. Freeman spent time at the beach, did some sightseeing, and went shopping. Mr. Queen bought fabrics during his stay. At no time did Mr. Queen discuss narcotics with Mr. Freeman. Mr. Freeman returned to the United States alone, as Mr. Queen spent a couple of extra days in Barbados.

Shortly after returning to the United States, Mr. Queen contacted Mr. Freeman and asked him if wanted to return to Barbados. Mr. Freeman said yes, and Mr. Queen offered to pay his way if he would go back to Barbados and pick up some artifacts for him. Mr. Queen told Mr. Freeman that he was not able to travel and preferred to have someone pick up the artifacts for him. Although Mr. Queen was insistent that Mr. Freeman travel on March 31, 2000, Mr. Freeman did not become suspicious. Mr. Freeman obtained permission from his supervisors to take some time off, and Mr. Queen gave him round-trip airline tickets.

Several days after his arrival in Barbados, Franklin contacted Mr. Freeman at his hotel. Franklin later showed up at Mr. Freeman's room with the suitcase. Franklin identified himself, told Mr. Freeman that he had entered the room through a balcony door, and opened up the suitcase for Mr. Freeman to look at. Mr. Freeman took a quick look and saw some wicker baskets in the suitcase. Nothing about the suitcase or its contents aroused Mr. Freeman's suspicion. Franklin did not discuss payment for the artifacts, did not give Mr. Freeman any money, and did not discuss narcotics. Franklin offered to give Mr. Freeman a ride to the airport, and drove him there on the day of his departure.

When he arrived at Miami International Airport, Mr. Freeman cleared Customs and was told that he could go. Mr. Freeman, however, went over and stood in another line because others were waiting there. That queue turned out to be the USDA inspection line.

Mr. Freeman denied knowing that the suitcase contained narcotics, and said he first learned of the cocaine when he was taken to the secondary inspection area. With respect to the post-it note, Mr. Freeman explained that he played lotteries and that the note was a good luck charm.

On cross-examination, Mr. Freeman said that he was not concerned about Mr.

Queen's insistence on traveling on a certain date because he had known Mr. Queen for a couple of years and trusted him. He did, however, concede that maybe he should have been suspicious.

## 2. MR. DEAR

The defense also called Darcy Dear as a witness to support the theory that Mr. Queen had set Mr. Freeman up. Mr. Dear, a citizen of Barbados and a resident of the United States living in New York, testified that he owned a bar in Barbados, and that he met Mr. Freeman and Mr. Queen in February of 2000 when they visited his establishment. Mr. Dear spoke to Mr. Queen again in late March of 2000 when he returned to New York. Mr. Queen asked Mr. Dear if he would be willing to travel to Barbados to bring back some documents for his company. Mr. Dear said he would be willing to do so if he was not footing the bill. Mr. Dear did not ask Mr. Queen why the documents could not be shipped or mailed from Barbados because he wanted to return to Barbados and was getting a free trip. Mr. Queen told Mr. Dear that he would be paid for the trip but did not mention an amount. Mr. Queen had someone deliver to Mr. Dear a round-trip ticket from New York to Barbados. Mr. Dear flew to Barbados on March 23, 2000, and was scheduled to return to New York on March 30, 2000.

As Mr. Queen had advised, an individual named Peter contacted Mr. Dear in Barbados, and asked to meet him by the boardwalk. When the two men met, Peter used his cellphone and made a call. Peter called the person on the other line "boss," and told him that he had the person there and that everything was in order. Peter then told Mr. Dear that there was some risk involved in the trip. Mr. Dear returned to his bar, and spoke to Mr. Queen on the phone. Mr. Queen referred to Peter as Franklin, told Mr. Dear not to talk to anyone about Franklin, and instructed Mr. Dear to be ready to return to New York in the next couple of hours. When Mr. Queen told Mr. Dear that another individual would meet him at the airport to provide him with the package, and warned him not to let the package out of his sight, Mr. Dear became suspicious. Although Mr. Queen never mentioned narcotics, Mr. Dear suspected cocaine was involved and made up a story about not being able to return to New York because his bar would be left unattended. Mr. Queen explained to Mr. Dear that he and his company were depending on him to make the trip and offered him money to keep the bar tended. Once Mr. Dear made clear that he was not going to travel back to New York, Mr. Queen became hysterical and screamed at him on the telephone. Mr. Dear did not use the return portion of the round-trip ticket that Mr. Queen had provided, and that unused ticket was introduced by the defense as an exhibit.

Soon after Mr. Freeman arrived in Barbados, Mr. Queen called Mr. Dear. Mr. Queen told Mr. Dear not to tell Mr. Freeman of their prior arrangements. Mr. Dear complied with this request and did not inform Mr. Freeman of what he had experienced even though Mr. Freeman came to his bar several times. According to Mr. Dear, Mr. Freeman was not streetwise like he was.

## C. THE SENTENCING PROCEEDINGS

After his conviction, Mr. Freeman submitted a safety valve statement under § 3553(f)(5). Mr. Freeman said that, reflecting on what transpired in Barbados, he "should have been suspicious" about the suitcase that Franklin gave him. Mr. Freeman maintained that he had been "set up" by Mr. Queen, whom he had known for several years and trusted.

At the initial sentencing hearing, the government acknowledged that Mr. Queen

did in fact exist. Although agents interviewed Mr. Queen, the government decided not to call him at trial because he would not be a good witness.

### III. DISCUSSION

■ The parties agree that Mr. Freeman meets the criteria set forth in § 3553(f)(1)-(4). They part company, however, with respect to § 3553(f)(5), which requires a defendant to "truthfully and fully disclose information within [his] knowledge relating to the crime for which [he] is being sentenced," even if the information is not helpful to the government. *United States v. Figueroa*, 199 F.3d 1281, 1283 (11th Cir.2000).

■ As the party seeking the benefit of the safety valve provisions, Mr. Freeman bears the burden of proving his eligibility. *See United States v. Cruz*, 106 F.3d 1553, 1557 (11th Cir.1997). Based on the entire record in this case, *see* 18 U.S.C. § 3661 & *United States v. Onofre–Segarra*, 126 F.3d 1308, 1310 (11th Cir.1997), I find that Mr. Freeman's safety valve statement is truthful and complete. In other words, I find that Mr. Freeman's account of events is accurate and that Mr. Freeman is forthright in saying that, although he should have been suspicious, he did not actually know about the cocaine in the suitcase Franklin gave him. First, I find Mr. Freeman to be a credible witness. Second, the safety valve statement is consistent with Mr. Freeman's post-arrest statement and his trial testimony. To the extent that Mr. Freeman admitted that he should have been suspicious only after he was found guilty, that post-conviction admission is truthful and satisfies § 3553(f)(5) as a temporal matter. *Cf. United States v. Brownlee*, 204 F.3d 1302, 1304 (11th Cir.2000) ("[L]ies and omissions do not, as a matter of law, disqualify a defendant from safety valve relief so long as the defendant makes a complete

and truthful proffer not later than the commencement of the sentencing hearing."). Third, given Mr. Freeman's passive demeanor, which I was able to observe during the trials and the sentencing proceedings, I have no doubt that Mr. Queen was able to dupe Mr. Freeman. Fourth, Mr. Freeman's account is supported by the testimony of Mr. Dear, an uninterested witness who was also credible. Mr. Dear's testimony concerning Mr. Queen's proposed venture was corroborated by the unused return ticket to New York, and fit with Mr. Freeman's version of events. For example, Mr. Freeman's testimony that Mr. Queen was insistent on his traveling on March 31, 2000, is consistent with the fact that Mr. Dear, who was scheduled to return to New York on March 30, 2000, had decided not to take anything back to Mr. Queen. Fifth, there is no longer any doubt that Mr. Queen exists, and the government chose not call him because he would not be a good witness. Sixth, the jury in the first trial could not reach a verdict, thereby indicating that some members of the panel entertained reasonable doubt about Mr. Freeman's guilt. Although there is no basis for setting aside the jury's guilty verdict, *see, e.g., United States v. Brown*, 53 F.3d 312 314 (11th Cir.1995) ("when a defendant chooses to testify, he runs the risk that if disbelieved 'the jury might conclude the opposite of his testimony is true'"), I believe that Mr. Freeman has told the truth and has given the government all information in his possession concerning the scheme to import the cocaine from Barbados.

### A. THE PARTIES' POSITIONS

■ The government asserts that the safety valve statement does not satisfy § 3553(f)(5) because Mr. Freeman continues to deny actual knowledge of the cocaine. According to the government, if a jury necessarily finds that a defendant

knew that he was carrying narcotics, then the defendant must admit to actual knowledge in his safety valve statement to comply with § 3553(f)(5). Relying on cases such as *United States v. Costales,* 5 F.3d 480, 488 (11th Cir.1993), the government asserts that I will be improperly going behind the jury's verdict if I find Mr. Freeman's safety valve statement to be truthful and complete

Mr. Freeman, on the other hand, maintains that the jury's verdict is not the last word on § 3553(f)(5), and contends that I must make an independent determination as to whether his safety valve statement is truthful. Citing to *United States v. Sherpa,* 110 F.3d 656, 662 (9th Cir.1996), and *United States v. Manzano–Excelente,* 934 F.Supp. 617, 621–22 (S.D.N.Y.1996), Mr. Freeman argues that I am privy to more information than the jury at his second trial (e.g., the first jury's inability to reach a verdict and the existence of Mr. Queen) and can find that his statement was truthful and complete without invading the province of the jury.

As explained below, I agree with Mr. Freeman.

## B. THE JUDGE, THE JURY, AND § 3553(F)(5)

The government's argument is based on the assumption that a jury's finding of knowledge has a preclusive effect on § 3553(f)(5). *See generally Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). This argument, however, is not supported by the language of § 3553(f)(5), which requires a district judge to disregard a mandatory minimum sentence if *he* finds ("if the court finds") *after conviction* that the defendant has provided a truthful and complete statement to the government concerning the

offense in question. The Supreme Court has repeated time and again that statutory interpretation "focuses on an analysis of Congress' efforts, not on speculation as to the internal thought processes of its Members." *Carter v. United States,* 530 U.S. 255, 271, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000). The government has failed to point to anything in the text or structure of § 3553(f)(5) which suggests that a post-conviction safety valve statement proclaiming innocence is, as a matter of law, untruthful and incomplete. Although Congress is free to categorically preclude safety valve relief to a defendant like Mr. Freeman, it has not done so, and it is not for the judiciary to question that legislative choice. *See generally Pennsylvania Dept. of Corrections v. Yeskey,* 524 U.S. 206, 212, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) ("[T]he fact that a statute can be 'applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.'").

 In a sense, § 3553(f)(5) looks outside of (and is external to) the adjudication of guilt by assigning to the judge the role of fact-finder with respect to the truthfulness and completeness of the defendant's safety valve statement. As the Eleventh Circuit has explained, "the responsibility for determining the truthfulness of the information the defendant provided to the government [is] the [judge's]." *United States v. Espinosa,* 172 F.3d 795, 797 (11th Cir.1999) (concluding that district judge erred in deferring to government as to whether defendant's statement satisfied § 3553(f)(5)). This does not mean, of course, that a jury's guilty verdict is irrelevant in the safety valve calculus. But just as the government does not have the final say under § 3553(f)(5), neither does the jury.[2]

---

2. The result might well be different with respect to the criteria set forth in § 3553(f)(1)-(4), which focus on historical facts independent of the defendant's safety valve statement. I need not express a view on this issue, how-

The only cases to have addressed the precise issue presented here have concluded, consistent with the Eleventh Circuit's view of the judge's role in *Espinosa,* that safety valve relief is not precluded as a matter of law simply because a jury rejects a defendant's claim of innocence and returns a verdict of guilty. *See Sherpa,* 110 F.3d at 662 (affirming, as not clearly erroneous, district judge's finding that defendant, who testified at trial but was found guilty of importing heroin, had satisfied § 3553(f)(5) by providing a safety valve statement in which he maintained his innocence: "[W]e have no difficulty holding that a district court may reconsider facts necessary to the jury verdict in determining whether to apply the safety valve provision.... [W]e hold that where actual knowledge is judicially established by a guilty verdict for purposes of punishment and, therefore, is an [i]ncontrovertible fact, there is no need for a defendant to relate it back at sentencing. To impose such a requirement confuses 'telling all' with qualifying for acceptance of responsibility. These are two very different concepts.... Consistent with the language of § 3553(f) and the different roles involved when determining guilty and imposing sentence, we hold that the safety valve requires a separate judicial determination of compliance which need not be consistent with a jury's findings."); *Manzano–Excelente,* 934 F.Supp. at 621–22 (finding that non-testifying defendant convicted of conspiring to distribute cocaine satisfied § 3553(f)(5) even though she maintained that she did not know that truck in question contained cocaine: "Nor is application of the safety valve provision automatically precluded whenever a defendant stands

trial and is convicted.... Under the plain wording of § 3553(f)(5), the trial judge has both the power and the obligation to decide whether and at what time a defendant told all that he or she knew.... One must accept the reality that an individual, innocent of the crime charged, may yet be convicted by the jury on legally sufficient evidence. That possibility will exist so long as fallible men and women, rather than angels, administer the criminal justice system."). *See also United States v. Collado–Fernandez,* 164 F.3d 619, 1998 WL 681318, *1 (2d Cir.1998) (unpublished decision) (noting district judge's understanding that safety valve requirements could be met "notwithstanding the jury's verdict").[3]

I find *Sherpa* and *Manzano–Excelente* persuasive, and believe that they are consistent with the Supreme Court's interpretation of the obstruction of justice provision, USSG § 3C1.1, in *United States v. Dunnigan,* 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). In relevant part, § 3C1.1 provides that a defendant's offense level can be increased by two if the defendant willfully impedes or obstructs the administration of justice. Despite the fact that obstructive behavior includes "testifying untruthfully ... concerning a material fact ... during ... trial," § 3C1.1, comment. n. 1(c), the Supreme Court refused to hold in *Dunnigan* that an obstruction enhancement is automatic if a defendant's testimony is rejected by a jury.. Instead, the Supreme Court acknowledged that a guilty verdict does not necessarily establish the falsity of a defendant's testimony at trial: "[N]ot every accused who testifies at trial and is convicted will incur an enhanced sentence under

---

ever, because the parties agree that Mr. Freeman has met these other criteria.

**3.** In *United States v. Quilca–Carpio,* 118 F.3d 719, 722 n. 2 (11th Cir.1997), the Eleventh Circuit noted that the district judge had found

a non-testifying defendant who maintained his innocence eligible for safety valve relief after a jury found him guilty of a narcotics offense, but did not have occasion to address the judge's ruling. *Quilca–Carpio* therefore does not have precedential valve.

§ 3C1.1 for committing perjury.... [A defendant's] testimony may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability or prove lack of intent." *See Dunnigan,* 507 U.S. at 95, 113 S.Ct. 1111 (explaining that inaccurate testimony may be the result of confusion, mistake, or faulty memory). A district judge must therefore make "independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition [set forth in *Dunnigan* ]." *Id.* If a defendant's testimonial denial of guilt at trial does not mandate an obstruction of justice enhancement, I fail to see how or why it automatically precludes safety valve relief. *See United States v. Catano–Alzate,* 62 F.3d 41, 42 (2d Cir.1995) (*"Dunnigan 's* requirement of fact-finding insures that courts will not automatically enhance sentences whenever the accused takes the stand and is thereafter found guilty."); *United States v. Turk,* 21 F.3d 309, 313 (8th Cir. 1994) ("It is not sufficient to enhance a sentence simply because a defendant testifies in his own behalf and the jury disbelieves him."); *United States v. McKean,* 835 F.Supp. 227, 232 (M.D.Pa.1993) ("This court may not automatically impose an upward adjustment for obstruction of justice whenever a defendant's testimony has been rejected by a judge or a jury."). *Cf. United States v. Gardiner,* 955 F.2d 1492, 1499 (11th Cir.1992) ("We conclude as a matter of law that the defendant's assertions do not justify [an obstruction of justice] enhancement because a presentence assertion cannot be material to sentencing if the assertion's truth requires the jury's verdict to be in error.").

Although *Manzano–Excelente,* which involved a non-testifying defendant, suggests in dicta that safety valve relief may not be appropriate if the defendant testifies at trial and is not believed by the jury, *see* 934 F.Supp. at 622, I do not think this suggestion is warranted. It is not uncommon for a defendant to proclaim innocence in a post-arrest statement but then not testify at trial. If the government introduces the defendant's post-arrest statement as a false exculpatory statement and the jury returns a verdict of guilty, it can be said with some confidence that the jury found the defendant's exculpatory statement unworthy of belief. Thus, in my view, the reasoning and holding of *Manzano–Excelente* apply with full force here.

 The cases cited by the government properly teach that judges cannot use departures to call guilty verdicts into question or nullify their effect. *See United States v. Adams,* 74 F.3d 1093, 1102–03 (11th Cir.1996) (district judge improperly granted downward departure to defendants convicted of money laundering on ground that their conduct did not cause the harm or evil sought to be prevented by money laundering statutes); *United States v. Haut,* 107 F.3d 213, 221 (3d Cir.1997) (district judge erred in departing downward based on poor credibility of the government's witnesses); *Costales,* 5 F.3d at 487–88 (after jury found defendant guilty of possessing child pornography and rejected entrapment defense, it was error for district judge to grant a downward departure based on the defendant's purportedly minor role in the offense). These decisions, however, are not controlling. First, as the Eleventh Circuit has explained, the "application of § 5C1.2 does not ... result in a departure from the guideline range. Rather, the application of § 5C1.2 allows a defendant to sentenced within the guideline range by granting relief from the minimum sentence mandated by statute." *Cruz,* 106 F.3d at 1556. Second, § 3553(f)(5) and § 5C1.2(5) expressly require the sentencing judge, after the jury has returned a verdict of guilty, to pass upon the truthfulness and completeness of

the defendant's safety valve statement. In undertaking that review, a judge is doing only what federal law mandates. He is in no way engaging in an end-run of the Sentencing Guidelines.

I am aware of cases like *United States v. Corrado,* 230 F.3d 1360, 2000 WL 1290343, *4 (6th Cir.2000) (unpublished decision), and *United States v. Weston,* 960 F.2d 212, 218 (1st Cir.1992), which hold that a guilty verdict requires the sentencing judge to accept facts necessarily implicit in the verdict. I do not question the holding of these cases in the absence of a statute, guideline, or rule to the contrary. Here, however, Congress and the Sentencing Commission have expressly and unambiguously provided that the judge is to determine whether a defendant's safety valve statement is truthful and complete, thereby providing what may be termed an exception to the general rule set forth in *Corrado* and *Weston. See Manzano–Excelente,* 934 F.Supp. at 622 ("[I]f the jury's guilty verdict precludes the judge from exercising his discretion under § 3553(f)(5), as the government argues[,] the consequences of a possibly mistaken verdict go unabated. I do not accept that proposition. The government may regard this analysis as judicial jury nullification. I regard it as the performance of a judicial responsibility mandated by Congress [and the Sentencing Commission].").

To the extent that the government relies on the Seventh Circuit's decision in *United States v. Thompson,* 106 F.3d 794 (7th Cir.1997), that case supports Mr. Freeman's interpretation of § 3553(f)(5). In *Thompson,* the defendants were convicted of possessing marijuana with the intent to distribute after testifying at trial that they were unaware of the marijuana in their car. The district judge found that the defendants, whose post-conviction safety valve statements mirrored their trial testimony, did not satisfy § 3553(f)(5). In af-

firming the judge's finding as not clearly erroneous, the Seventh Circuit explained that the judge considered "not only the trial and resulting verdict," but also the statements of the probation officer and the prosecutor that the defendants were not cooperative. Because the judge was entitled to credit the probation officer and the prosecutor, the Seventh Circuit deferred to his safety valve ruling. *See id.* at 800. At no time, however, did the Seventh Circuit hint that the jury's guilty verdict would have precluded the judge from finding that the defendants satisfied § 3553(f)(5). Indeed, the Seventh Circuit only said the unremarkable—that like the jury, the judge was entitled (but not required) to reject the defendants' claims that they were not involved in the marijuana scheme. *See id.* at 801 ("Thompson and Andalon told the same story to the jury which, as we noted above, acted rationally in rejecting it and convicting them. The sentencing judge was *entitled* to reject the claim of non-involvement, too.") (emphasis added). *Accord United States v. Arroyo,* 125 F.3d 842, 1997 WL 597999, *1 (1st Cir.1997) (unpublished decision) (district judge's determination that defendant's claim of innocence is not truthful "cannot be error" if jury has returned a verdict of guilty).

The government further argues that I would turn *United States v. Watts,* 519 U.S. 148, 151–53, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (holding that district judges may consider acquitted conduct under the Sentencing Guidelines as long as such conduct is proved by a preponderance of the evidence), on its head by disregarding the jury's finding of knowledge. Not so. Although I agree that *Watts* does not control because of the different juxtaposition of the burdens of proof, neither does it mandate acceptance of the government's interpretation of the safety valve provisions. Indeed, in at least one respect—the

Supreme Court's use of the text of 18 U.S.C. § 3661 and the structure of the Sentencing Guidelines to ascertain whether acquitted conduct can be considered—*Watts* supports the type of textual analysis that I have attempted here.

One final matter persuades me that the government's position is not the correct one. At the initial sentencing hearing, the government came close to conceding that, had I given the jury a deliberate ignorance instruction, Mr. Freeman would not be precluded from obtaining safety valve relief. The government reasoned that if the jury had been given such a charge, it might have based its guilty verdict on Mr. Freeman's willful blindness, and Mr. Freeman's safety valve statement then would not be necessarily inconsistent with the verdict. It seems to me that the government's focus on my decision to not give a certain jury instruction is misplaced. As noted above, § 3553(f)(5) is concerned with the defendant's post-conviction statement, and not with legal rulings made by the judge prior to sentencing. Such rulings, like all other matters in the record, are certainly relevant under § 3553(f)(5) and may inform a judge's ultimate decision, but they do not delineate the factual parameters by which a safety valve statement is evaluated.

### IV. CONCLUSION

One need not embrace Ambrose Bierce's description of a jury[4] to acknowledge that some guilty verdicts, though legally unassailable, are factually erroneous. As Justice Frankfurter put it some time ago, "[o]ur penal codes are loaded with prohibitions of conduct depending on ascertainment through fallible judges and juries of a man's intent or motive—on ascertainment, that is, from without of a man's

inner thoughts, feelings, and purposes. Of course a man runs the risk of having a jury of his peers misjudge him." *Winters v. New York*, 333 U.S. 507, 534–35, 68 S.Ct. 665, 92 L.Ed. 840 (1948) (dissenting opinion).

In this unusual case, I find, despite the jury's guilty verdict, that Mr. Freeman did not know that the suitcase he brought from Barbados contained cocaine. Because Mr. Freeman's safety valve statement satisfies 18 U.S.C. § 3553(f)(5) and USSG § 5C1.2(5), I shall not impose a mandatory minimum sentence.

---

4. "Jury, *n.* A number of persons appointed by a court to assist the attorneys in preventing law from degenerating into justice." AM-

BROSE BIERCE, THE UNABRIDGED DEVIL'S DICTIONARY 140 (Univ. of Georgia Press 2000).